# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| WILLIAM N. HEWITT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 10-CV-494-PJC |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Claimant, William N. Hewitt ("Hewitt"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Hewitt's application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Hewitt appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Hewitt was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Hewitt was 37 years old at the time of the hearing before the ALJ on May 11, 2009. (R. 24, 28). He had an eleventh grade education and obtained a GED. (R. 28).

Hewitt testified that the problems that contributed to his inability to work were headaches

and pain and stiffness in his neck and back. (R. 30). He had neck pain every day and took pain medication every day. (R. 30-31). He had some back pain every day, although the severity depended on whether he had done something to aggravate his back. (R. 31). He had headaches every two to three days that might last for an hour or two and that he would rate as a four or five on a scale of one to ten. (R. 30-31). About once a month, he experienced a migraine headache that might last up to four hours. *Id.*

Hewitt testified that he had trouble sleeping. (R. 32). For three or four months before the hearing, he had been awakened frequently at night by vivid dreams. *Id.* Before the vivid dreams, he had awakened frequently as well, and he had trouble getting to sleep. (R. 33). During the day, he would lie down if his neck or back bothered him. (R. 33-34).

He estimated that he could sit for up to two hours at a time. (R. 34). After that, it would aggravate his neck and lower back, and he would get up, stretch, and walk around. *Id.* After walking around for ten minutes, he might be able to resume sitting for thirty minutes. *Id.*

Hewitt did not drive because he was too stressed and scared. (R. 34-35). He described obsessive behaviors regarding cleaning and making sure that doors were locked. (R. 35). He didn't do any shopping because he didn't drive and he didn't have any money, but he also did not enjoy shopping because of the crowds. (R. 35-36). He felt in danger. (R. 36). He wanted to be around only about three people at a time. *Id.* He needed reminders to take his medications sometimes. *Id.* He did not leave his apartment approximately five days a week. *Id.* About three times a month, he didn't get out of bed. (R. 36-37).

Hewitt testified that his mental condition and his need for medication sometimes scared him. (R. 37-38). Before he took medication, he had visual hallucinations that were extremely scary. (R.

38). He continued to have hallucinations, primarily at night, but they were not as scary because he was taking medication. *Id.* He experienced auditory hallucinations about once a week. *Id.*

Hewitt testified that, in the month of March before the hearing, he had a particularly bad episode lasting about a week which he described as a "dream-like" state. (R. 38-39). He could experience that dream state about twice a month. (R. 39). He had mood cycles or changes every day from extreme highs to extreme lows. *Id.*

The administrative transcript includes records from Fike Chiropractic Clinic indicating that Hewitt was a passenger in a vehicle that was rear ended on December 27, 1999. (R. 346). Hewitt suffered from headaches and pain in his mid-back and low back, but was considered at maximum medical improvement and released from the chiropractor's care on March 14, 2000. (R. 365).

Hewitt was admitted to Laureate Psychiatric Clinic and Hospital on November 15, 2000. (R. 252-305). A treatment plan dated November 16 stated his Axis I[1] diagnoses as major depressive disorder, recurrent, severe, without psychotic features, and cannabis dependence. (R. 282). His global assessment of functioning ("GAF")[2] was assessed as 35 currently and 65 highest in past year. *Id.* He was discharged on November 18, 2000, and his GAF was assessed at that time as 65. (R.

---

[1]The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereafter "DSM IV").

[2]The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

291-92).

Hewitt was hospitalized at Hillcrest Medical Center from March 17 to March 20, 2005. (R. 176-96). The discharge summary stated that Hewitt had been admitted due to depression with some psychotic thinking. (R. 176). Hewitt had not been taking his medication reliably, and he had been using marijuana. *Id.* He had become depressed with some suicidal ideation. *Id.* The discharge diagnoses on Axis I were major depression and polysubstance abuse. *Id.* His GAF was rated as 55, with a highest in the past year of 70. *Id.* His GAF on admission had been rated as 35. (R. 177-79).

Hewitt was evaluated by Norman J. Findahl, LSW, at the Pawnee Health Center (the "Pawnee Clinic") for bipolar disorder on August 27, 2007. (R. 247). Hewitt described family tensions. *Id.* He has stated that he had not been taking his medications as prescribed, and he had been seeing hallucinations and experiencing auditory hallucinations. *Id.* The diagnoses were bipolar I disorder, most recent episode depressed, severe, without psychotic features; intermittent explosive disorder; borderline personality disorder; panic disorder, with agoraphobia; and family conflict. *Id.*

On September 17, 2007, Hewitt saw Linda Cummings, M.D. at the Pawnee Clinic, and he again described family tensions. (R. 246). Several items were circles on a list on the form, including tobacco use, alcohol use, and recreational drug use. *Id.* Pain was indicated as present at the level of two on a scale of one to ten. *Id.* Four prescription medications were continued, and he was to continue therapy with Ms. Findahl. *Id.*

On December 31, 2007 at the Pawnee Clinic, in addition to the circled items that were present at the September 17 visit, Hewitt had fleeting suicidal thoughts and had experienced visual hallucinations. (R. 245). He described his pain as a six or seven. *Id.* Hewitt was seen by Dr. Cummings again on January 28, 2008. (R. 244). On February 15, 2008, Hewitt reported to Ms.

4

Findahl that he had experienced thoughts of cutting himself, but had not acted on them. (R. 242). On February 25, 2008, Hewitt reported to Dr. Cummings that he had increased anxiety and visual hallucinations, along with episodes of forgetfulness and difficulty concentrating. (R. 241). On March 24, 2008, Hewitt reported increased hallucinations. (R. 240). On April 25, 2008, Hewitt reported experiencing auditory hallucinations. (R. 234).

At the Pawnee Clinic on May 23, 2008, Hewitt reported increased alcohol use, but no recreational drug use, to Dr. Cummings. (R. 345). He had continued visual and auditory hallucinations. *Id.* On June 30, 2008, Hewitt reported increased family stress from his mother's hospitalization. (R. 344). He had thoughts of cutting himself, but did not act on them. *Id.* He reported no auditory hallucinations and a pain level of six. *Id.* On August 25, 2008, he again reported visual hallucinations and a pain level of five. (R. 343). He reported relationship stress on October 20, 2008, continued visual hallucinations, and a pain level of five. (R. 342). On December 5, 2008, Hewitt reported that he had "cut on" himself three weeks previously when he was angry. (R. 341). He had continued visual hallucinations and a pain level of six. *Id.*

On December 5, 2008, Dr. Cummings completed a Pawnee Nation form for eligibility for a food distribution program. (R. 251). Dr. Cummings stated that Hewitt was under a doctor's care and unable to work. *Id.* She wrote that he could not be at a workplace long due to hallucinations and agoraphobia, and she stated that his inability to work was expected to continue for an indeterminate length of time. *Id.*

On January 2, 2009, at the Pawnee Clinic, Hewitt reported to Dr. Cummings that he was anxious and uneasy. (R. 340). He reported sensations that things were crawling on him. *Id.* On January 30, 2009, Hewitt reported that he had been experiencing nightmares and vivid dreams. (R.

339). At a February appointment, Hewitt reported that the nightmares had ended, and he still had visual hallucinations of shadows. (R. 338). On March 30, 2009, Dr. Cummings noted that Hewitt had been psychotic in the first week of March, cutting on his arms and forehead. (R. 337). He was disassociating in a "dream" state. *Id.* He had visual hallucinations and a pain level of seven, and he reported that he had an upcoming doctor's appointment regarding his neck and back pain. *Id.*

On April 10, 2009, Hewitt was seen by a physician at the Pawnee Clinic for his physical complaints of dizziness, numbness in his shoulders and fingers, fatigue, back pain, headaches, and short attention span. (R. 321-24). The physician's hand-written notes are difficult to decipher, but it appears that Hewitt was prescribed Flexeril and other medications. (R. 318, 322). X-rays of Hewitt's cervical spine apparently showed a "minor abnormality" of degenerative disk disease at the C/4 through C/7 levels. (R. 314).

On April 30, 2009, Hewitt reported to his therapist, Ms. Findahl, at the Pawnee Clinic that he had obsessive behaviors of cleaning and washing his hands. (R. 336). He had visual hallucinations along with feelings that bugs were crawling on him. *Id.* He described problems with rages, anxiety, and panic attacks. *Id.* At a May appointment with Dr. Cummings, Hewitt reported no tobacco use because he had run out of cigarettes, no alcohol use, and no recreational drug use. (R. 415). He reported no hallucinations but fleeting thoughts of suicide in the week before the appointment. *Id.*

On May 6, 2009, Dr. Cummings completed a "checkbox" form entitled Mental Residual Functional Capacity Assessment, and a narrative Mental Status Form. (R. 306-09). Dr. Cummings checked boxes indicating that Hewitt had severe limitations in five areas, such as the ability to respond appropriately to changes in work setting. (R. 306-07). She found marked limitations in six

6

other areas, including Hewitt's ability to maintain attention and concentration and his ability to interact appropriately with the general public. *Id.* She found one area of moderation limitation and eight areas in which Hewitt had no significant limitation. *Id.*

On the narrative form, Dr. Cummings made two pages of hand-written comments. (R. 308-09). After noting Hewitt's appearance, she stated that he routinely had problems with socialization, including irritability and hostility in public and at home. (R. 308). Dr. Cummings also stated that Hewitt withdrew "totally" approximately six or seven times a year. *Id.* During these times of withdrawal, Hewitt found his hallucinations more troublesome and he also resorted to self-mutilation. *Id.* She said that Hewitt routinely saw visual hallucinations even though he took high levels of antipsychotic medication, and he also had episodes of dissociation during which he felt like he moved in a "dream state." *Id.* Dr. Cummings recommended that Hewitt stay on medication and stay in therapy, but she stated that his "[p]rognosis for recovery is poor." (R. 309). She noted that his illness fluctuated. *Id.* She said that Hewitt could handle simple instructions. *Id.* She said that "[w]ork pressure, supervision, and co-workers" were things that Hewitt did not handle well. *Id.* Her diagnoses were psychotic disorder not otherwise specified, panic disorder with agoraphobia, and borderline personality disorder. *Id.*

On July 1, 2009, at an appointment with Dr. Cummings at the Pawnee Clinic, Hewitt reported tobacco use and "very little" alcohol use, along with no recreational drug use. (R. 414). He described visual and auditory hallucinations, and he also rated the level of his neck and back pain as six. *Id.* On August 14, 2009, Hewitt was not doing well, and he was isolating himself and seeing spiders. (R. 412). On September 14, 2009, Hewitt saw his therapist, Ms. Findahl, and showed her a scar where he had intentionally burned himself with a cigarette. (R. 409). He reported low

motivation and stated that he usually stayed in bed all day. *Id.* Hewitt saw Dr. Cummings the same day, and she described him as depressed, isolating, and feeling very hopeless. (R. 411).

On September 29, 2009, Hewitt telephoned Ms. Findahl at the Pawnee Clinic to state that he felt that he was a danger to himself, but did not want to be hospitalized. (R. 407). He had been burning himself. *Id.* He said that he did not want to leave his house, and he requested that she come to his house to see him. *Id.* On October 26, 2009, Hewitt saw Dr. Cummings and was doing better. (R. 404). He was having fewer visual hallucinations but still having auditory hallucinations. *Id.*

On November 12, 2009, Hewitt was seen at the Pawnee Clinic for his complaints of neck and back pain. (R. 377).

At an appointment with Dr. Cummings on December 11, 2009, Hewitt was "very down" and angry, with increased nightmares. (R. 403). On January 22, 2010, Hewitt reported that he was not sleeping well and was having frequent dreams that would wake him up. (R. 402). He rated his back, neck, and shoulder pain as an eight. *Id.* He was improved on February 19, 2010. (R. 401).

Agency consultant George Malatinszky, M.D. completed a physical evaluation of Hewitt on April 1, 2006. (R. 202-09). Hewitt's chief complaint was chronic depression. (R. 202). The examining physician noted "poorly healed scars" on both of Hewitt's wrists. (R. 203). He found no other physical abnormalities. (R. 202-09).

Agency consultant Laurie Clemens, Ph.D. completed a Mental Status Examination of Hewitt on February 22, 2006. (R. 197-201). Dr. Clemens characterized some of the evaluations of Hewitt's attention, concentration, and memory as "low" or "a little low." (R. 200). She estimated his intellectual functioning as low average. (R. 201). Her impression was personality disorder not otherwise specified. *Id.* In her comments, she stated that she had not reviewed any mental health

records. *Id.* Dr. Clemens considered Hewitt's description of symptoms to be "vague" and his description of his hallucinations to be inconsistent with typical hallucinatory experiences. *Id.* She believed objective testing would be helpful. *Id.*

Agency consultant Michael D. Morgan, Psy. D., completed a second Mental Status Examination of Hewitt on November 12, 2007. (R. 210-13). Dr. Morgan apparently did not do any formal testing and based his conclusions on observations. *Id.* He did not observe any problems with Hewitt's memory or concentration. (R. 212). He considered there to be insufficient signs and symptoms to determine a specific mood disorder or specific anxiety disorder, although he felt that Hewitt met the criteria for anxiety disorder, not otherwise specified. *Id.* Dr. Morgan's opinion was that Hewitt's thought process was normal and that Hewitt was functioning on an average level of intelligence. (R. 213). His primary diagnosis on Axis I was anxiety disorder not otherwise specified, and he also included cannabis dependence, course unspecified. *Id.* He included notes to rule out malingering and noncompliance with treatment. *Id.* He assessed Hewitt's GAF as 66-70. *Id.* He stated that Hewitt could achieve a more normal level of functioning in less than one year "[w]ith compliance to appropriate treatment." *Id.*

Agency nonexamining consultant Sally Varghese completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on January 29, 2008. (R. 214-31). For Listing 12.04, Dr. Varghese noted Hewitt's depressive syndrome. (R. 221). For Listing 12.06, Dr. Varghese noted Hewitt's anxiety disorder, not otherwise specified. (R. 223). For Listing 12.09, Dr. Varghese noted behavioral changes associated with the regular use of substances that affect the central nervous system, and she noted cannabis dependence, course unspecified.. (R. 226). For the

"Paragraph B Criteria,"[3] Dr. Varghese found that Hewitt had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 228). In the "Consultant's Notes" portion of the form, Dr. Varghese noted Hewitt's psychiatric hospitalization in 2005. (R. 230). She apparently did not have any records from Dr. Cummings' office or any other medical evidence of record, because she stated that "no current MER could be obtained to verify" Hewitt's medications. *Id.* She then recited a brief summary of Dr. Morgan's examination and conclusions. *Id.* She also summarized Hewitt's activities of daily living as he had reported them to Dr. Morgan. *Id.*

In her Mental Residual Functional Capacity Assessment, Dr. Varghese found that Hewitt was moderately limited in his ability to understand, to remember, and to carry out detailed instructions. (R. 214). Dr. Varghese also found Hewitt to be moderately limited in his ability to interact appropriately with the general public. (R. 215). She found no other significant limitations. (R. 214-15). Dr. Varghese stated that Hewitt could perform simple and some complex tasks, could "relate to others on a superficial work basis," and could adapt to a work situation. (R. 216). She said that Hewitt should avoid contact with the general public. *Id.*

---

[3]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

**Procedural History**

Hewitt filed applications on July 30, 2007, seeking disability insurance benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq.* (R. 94-100). The applications were denied initially and on reconsideration. (R. 53-60, 62-67). A hearing before ALJ Lantz McClain was held May 11, 2009 in Tulsa, Oklahoma. (R. 24-46). By decision dated August 26, 2009, the ALJ found that Hewitt was not disabled at any time through the date of the decision. (R. 13-23). On June 18, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1-6). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If

---

[4]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant

a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ found that Hewitt met the insured status requirements through September 30, 2011. (R. 15). At Step One, the ALJ found that Hewitt had not engaged in any substantial gainful activity

---

suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

since his alleged onset date of June 8, 2005. *Id.* At Step Two, the ALJ found that Hewitt had severe impairments of major depressive disorder, generalized anxiety disorder, and personality disorder. *Id.* He found that other alleged impairments were non-severe. (R. 15-16). At Step Three, the ALJ found that Hewitt's impairments did not meet a Listing. (R. 16).

The ALJ determined that Hewitt had the RFC to do the full range of light work with the additional limitations of "perform simple and repetitive tasks, and no more than incidental contact with the public." (R. 17). At Step Four, the ALJ found that Hewitt was unable to perform any past relevant work. (R. 21). At Step Five, the ALJ found that there were jobs that Hewitt could perform, taking into account his age, education, work experience, and RFC. (R. 22-23). Therefore, the ALJ found that Hewitt was not disabled at any time from June 8, 2005, through the date of his decision. (R. 23).

## Review

While Hewitt raises numerous issues on appeal, the Court finds that the ALJ's decision must be reversed because it did not sufficiently address the forms completed by Hewitt's treating physician, Dr. Cummings. Because reversal is required on this issue, the other issues Hewitt raises on appeal are not addressed.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a

treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.*

The ALJ did a good job of summarizing the opinion evidence submitted by Dr. Cummings. (R. 20). He then included two general boilerplate statements regarding Dr. Cummings' opinions:

> Dr. Cummings' opinion contrasts sharply and is without substantial support from the other evidence of record, which obviously renders it less persuasive. It is not clear that the doctor is familiar with the definition of "disability" contained in the Social Security Act and regulations.

*Id.* The ALJ's discussion of the meaning of "disability" was not relevant to the analysis of Dr. Cumming's opinion evidence. It can be legitimate to discount a treating physician opinion when there is a difference in meaning of terms, such as the meaning of "disability" in the context of workers compensation. *See, e.g., Seever v. Barnhart*, 188 Fed. Appx. 747, 753 (10th Cir. 2006) (unpublished); *Jones v. Barnhart*, 53 Fed. Appx. 45, 47 (10th Cir. 2002) (unpublished). Here, however, Dr. Cummings did not give only opinions that Hewitt was "disabled." Instead, she checked boxes indicating her opinion of the degree of Hewitt's impairment regarding specific functions, such as Hewitt's severe limitation in his ability to respond appropriately to changes in a work setting. (R. 306). The categories of degree of impairment were defined on the form. (R. 306-07). Given the nature of the opinions given by Dr. Cummings, her familiarity with the Social Security definition of "disability" was not particularly relevant, and this factor did not justify rejection of her opinions. This boilerplate provision adds nothing of substance to the ALJ's decision. *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) (boilerplate statements "[fail] to inform us in a meaningful,

reviewable way of the specific evidence the ALJ considered").

The same is true of the ALJ's introductory sentence that Dr. Cummings' opinion contrasted with "other evidence of record." This is a legitimate reason for discounting a treating physician opinion, but only if the analysis is done correctly and specific examples are given. When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they outweigh the treating physician's report, not the other way around. *Hamlin*, 365 F.3d at 1215 (quotation omitted). Here, because the ALJ gave no indication of how he examined Dr. Cummings' reports versus the other medical evidence, the reviewer cannot determine whether the ALJ's approach in weighing the different opinion reports was correct. *See Langley*, 373 F.3d at 1123 ("Because the ALJ failed to explain or identify what the claimed inconsistencies were between [the treating physician's] opinion and the other substantial evidence in the record, his reasons for rejecting that opinion are not 'sufficiently specific' to enable this court to meaningfully review his findings.").

After these introductory boilerplate provisions, the ALJ recited the requirements regarding treating physician opinion evidence, including the factors that an ALJ must consider. *Id.* After reciting the factors, the ALJ ignored them, with no discussion of the length of the relationship between Hewitt and Dr. Cummings, the nature and extent of their treating relationship, or other relevant factors. *Id.* Instead, the ALJ included additional boilerplate statements that did not articulate anything specifically about the opinions given by Dr. Cummings. *Id.* He stated that the determination of RFC is an issue reserved to the Commissioner and that treating physician opinion is "never entitled to controlling weight." As was true of the previous boilerplate provisions, this statement fails to inform this reviewing Court of the reasons why the ALJ rejected or discounted the

15

opinion evidence of Dr. Cummings.

The next sentence also adds nothing of substance to the ALJ's analysis of Dr. Cummings' evidence: "The record does not indicate what records or what objective tests Dr. Cummings based her opinion on." (R. 20). The Tenth Circuit has previously acknowledged that psychological opinions need not be based only on objective tests. *Thomas v. Barnhart*, 147 Fed. Appx. 755, 759 (10th Cir. 2005) (unpublished), *citing Robinson*, 366 F.3d at 1083. It would seem to be an unnecessary requirement for Dr. Cummings to explicitly state that her opinions were based on her more than 20-month treating relationship with Hewitt and her observations during their almost monthly office visits.[5] The observations that Dr. Cummings made in her regular sessions with Hewitt constituted "specific medical findings," and her failure to explicitly cite those observations as support for her medical opinions does not undermine her reports. *Wise v. Barnhart*, 129 Fed. Appx. 443, 447 (10th Cir. 2005) (unpublished) (treating physician observations constituted "specific medical findings" supporting a psychological opinion).

The ALJ then stated a reason that would be legitimate, if supported by specific examples, for discounting or rejecting Dr. Cummings' reports. "While the undersigned has carefully considered Dr. Cummings' opinion, it cannot be given controlling weight because it is in conflict and inconsistent with Dr. Cummings own treatment records and other substantial evidence as noted above." (R. 20). The ALJ gave no examples of how Dr. Cummings' opinions differed from her treatment records. The undersigned has reviewed the records of Dr. Cummings' treatment of Hewitt from the earliest record in September 2007 through the date of the forms, and those records appear

---

[5]This reviewer finds that the administrative transcript contains records of approximately monthly visits of Hewitt with Dr. Cummings from September 17, 2007 through the date that Dr. Cummings completed the forms on May 6, 2009. (R. 234, 240-42, 244-46, 337-45, 415).

to be very consistent with the opinions expressed by Dr. Cummings. For example, Hewitt reported hallucinations in December 2007, February, March, April, May, August, October, and December 2008, and February, March, and April 2009. (R. 234, 240-41, 245, 336-38, 341-43, 345). Hallucinations were specifically mentioned by Dr. Cummings on the Mental Status Form. (R. 308). Hewitt reported cutting himself in episodes of anger or psychosis in December 2008 and March 2009, and he reported impulses to cut himself that he did not act on in February and June 2008. (R. 242, 337, 341, 344). On the Mental Status Form, Dr. Cummings explained that Hewitt had episodes of isolating behaviors during which he sometimes "resorts to self mutilation." (R. 308). Dr. Cumming's treatment notes are filled with references to Hewitt feeling stress, being anxious, and experiencing rage. (R. 234, 240-42, 244-46, 337-45, 415). All of these mental issues were referenced in the reports that Dr. Cummings completed. (R. 306-09). Thus, the undersigned finds that Dr. Cumming's opinions are consistent with her treatment notes and her observations of Hewitt's psychological condition over the 20-month treating relationship from September 2007 through May 2009.

For the second part of his statement regarding the discounting of Dr. Cummings' opinion, the ALJ did not give any examples of how those opinions were in conflict and inconsistent with "other substantial evidence as noted above." (R. 20). The undersigned assumes that the ALJ was referring to the evidence of Dr. Clemens, Dr. Morgan, and Dr. Varghese, which the ALJ had summarized in his decision. (R. 19-20). The ALJ himself noted that generally a nonexamining opinion such as Dr. Varghese's is not accorded as much weight as the opinions of examining physicians. As the undersigned emphasized in the introduction to this discussion, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the

opinion of a nonexamining consultant is given the least weight. *Robinson,* 366 F.3d at 1084. The ALJ's discussion does not give any supported reasons for favoring the opinion evidence of Dr. Clemens, Dr. Morgan, and Dr. Varghese over the evidence of Dr. Cummings. Moreover, the undersigned finds that none of those physicians had available to them the treating records of Dr. Cummings at the time of their reports. (R. 197-201, 210-31). Dr. Clemens commented that "[a]dditional information, such as mental health records and/or objective tests would be invaluable in obtaining a definitive diagnosis on this young man." (R. 201). Dr. Morgan did not list Dr. Cummings' treatment records as one of his sources of information. (R. 210). Dr. Varghese said that there was no current medical evidence of record to verify that Hewitt was taking antidepressants and anti-anxiety medications. (R. 230). Because Dr. Clemens and Dr. Morgan conducted examinations that appear to have been brief and superficial, and they did not have available to them the information from Dr. Cummings' treating records, their evidence is not especially strong. *See Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987) (findings of nontreating physician were of suspect reliability when they were based upon limited contact and examination, and the physician had failed to carefully study claimant's history or prior examinations). Under these circumstances, the ALJ needed to provide more analysis regarding what conflicts he found between the evidence of the nontreating physicians and Dr. Cummings and why he resolved those conflicts in favor of the nontreatng physicians' evidence.

The ALJ's decision must be reversed so that the ALJ can properly consider the treating physician opinion evidence of Dr. Cummings.

Because the errors of the ALJ related to the opinion evidence require reversal, the undersigned does not address the remaining contentions of Hewitt. On remand, the

Commissioner should ensure that any new decision sufficiently addresses all issues raised by Hewitt.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

### Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 17th day of August, 2011.

_____
Paul J. Cleary
United States Magistrate Judge